UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

In re:

Ulrich Felix Anton Engler,                              Case No. 9:08-bk-04360-MGW
Private Commercial Office, Inc., and
PCO Client Management, Inc.                             Chapter 7
                                                        (Substantively Consolidated)
            Debtor.
_____/

Robert E. Tardif, Jr., as Trustee for
the Chapter 7 Bankruptcy Estates
of Ulrich Felix Anton Engler and
Private Commercial Office, Inc.,

            Plaintiff,

vs.                                                     Adv. Pro. No.: 9:10-ap-00516-MGW

Friedrich Herrling,

            Defendant.
_____/

**MEMORANDUM OPINION ON COMPLAINT
TO AVOID AND RECOVER FRAUDULENT TRANSFERS
AND FOR UNJUST ENRICHMENT**

Under § 548(c) of the Bankruptcy Code, the initial transferee of a fraudulent transfer may

avoid liability if the transferee gave adequate consideration and received the transfer in good

faith.  Alternatively, recovery from the initial transferee is unavailable if the transferee can

demonstrate that he was a mere conduit for the transfer -- lacking control over the property at

issue and acting in good faith as to his involvement in the transaction.

In the present case, the Debtor made two distinct sets of transfers to the Defendant.  The

first transfers were interest payments on the Defendant's personal investment.   The second

transfers were made to the Defendant for the sole purpose of distributing interest payments to

other investors.  Thereafter, the Defendant passed all of the earmarked funds on to the intended

investor beneficiaries.  Although the Defendant certainly had a pecuniary interest in the
continued success of the Debtor, he has demonstrated that he lacked knowledge that the Debtor
was operating a Ponzi scheme and was insolvent.  Based on the evidence, the Court finds that the
Defendant also acted in good faith at all times relevant to this proceeding.  Accordingly, the
Court finds in favor of the Defendant.

<u>Factual Background</u>

From 2005 to 2007, Ulrich Felix Anton Engler ("Engler") operated Prime Commercial
Office, Inc. ("PCO") and later PCO Management, Inc. ("PCOM") for the sole purpose of
orchestrating a multinational Ponzi scheme.[1]  In order to lure investors, Engler created a large
solicitation campaign consisting of in-person presentations and advertisements at international
sporting events and other venues.  As part of his pitch, Engler stated that he possessed a proven
track record of success at some of the world's largest commercial banks.  Engler also represented
that his company, PCO, possessed proprietary market analysis software enabling it to effectuate
trades faster than other investors, yielding enormously large and sustainable profits.[2]  In
furtherance of these assertions, Engler presented false performance records and promised annual
returns as high as seventy-two percent.[3]

In fact, Engler was never employed at a major bank, and PCO did not possess any of its
asserted competitive advantages.  PCO made no substantial investments from 2005-2007.[4]  As

---

[1] This bankruptcy case was initiated by involuntary petitions against the debtors, Engler, PCO, and PCOM filed on
March 31, 2008. On April 23, 2010, the Court entered an order substantively consolidating the three estates. (Doc.
No. 242).

[2] Plaintiff's Exhibit ("Pl's. Ex.") 9, at 3-4 (Adv. Doc. No. 72-17).

[3] *Id.* at 6.

[4] *Id.*

such, the only way for Engler and PCO to make good on the returns promised to investors was to acquire new investment funds at an exponential rate.  The record shows that from March 31, 2005 to March 31, 2006, PCO grew its net investments under management 5200% from $180,705 to $9.5 million.[5]  By September 30, 2007, investments in PCO and/or PCOM had grown to more than $100 million, representing a 55,800% increase in just two and a half years.[6]

In typical Ponzi scheme fashion, Engler relied heavily upon various brokers to act as agents and pitchmen for new investors.  The Defendant, Friedrich Herrling, began brokering investments in PCO to other investors in 2006.[7]  The Defendant also made a personal investment in PCO in the amount of $14,980 on June 14, 2007.[8]  In exchange for his brokering services, the Defendant was paid a commission on new investments that he and two affiliated entities brought to PCO.[9]  For nearly two years the Defendant directly and indirectly brought in numerous investors, including his son and his mother who invested $20,000.[10]  Monthly distributions were made to entity-level investors at a rate of 50-100% of the interest payment the entity received from PCO and/or PCOM.[11]  This case involves two sets of transfers made by PCOM in furtherance of this scheme.

---

[5] *Id.* at Ex. B.

[6] *Id.*

[7] Trial Transcript ("Tr.") at 7-9 (Adv. Doc. No. 75-1).

[8] Joint Stipulation of Facts ("Stipulation") ¶ 1 (Adv. Doc. No. 66).

[9] Tr. at 132-135.

[10] *Id.* at 64, 98.

[11] *Id.* at 18-23.

The first transfers, totaling $2,696.40, were made by PCOM to the Defendant as an interest payment on the Defendant's personal investment in PCO.[12]  The second transfers, totaling $65,729.96, were interest payments by PCOM that were initially directed to one of the Defendant's affiliated entities, Congro Finance AG.[13]  However, Swiss authorities had frozen Congro's account on suspicion of international money laundering, and the intended transfer was denied.[14]  As such, a PCO representative contacted the Defendant requesting to deposit the Congro monthly interest payments into the Defendant's personal account, to be redistributed to Congro investors.  The Defendant believed that Congro's account had been frozen due to the Defendant's previous failure to complete an international transfer form.  As such, he agreed to accept the various wire transfers for redistribution.[15]

Shortly thereafter, the Defendant learned that Engler was wanted by domestic and international authorities on suspicion of criminal activity.[16]  The Defendant was soon arrested and later convicted by a German court of soliciting investors without a proper license.[17]  He received a two-year suspended prison sentence for the violation.[18]  In entering its verdict, the German court did not render an opinion as to whether the Defendant knew that Engler was

---

[12] Defendant's Exhibit ("Df.'s Ex.") 4, at 2 (Adv. Doc. 54-4); Stipulation, ¶¶ 2-4.

[13] Tr. at 52-53; Adv. Doc. No. 26 at 3, ¶¶ 9-10.

[14] Defendant's Affidavit at 3, ¶¶ 9-10.  (Adv. Doc. No. 26).

[15] *Id.*

[16] Tr. at 55.

[17] Pl.'s Ex. 15 (Adv. Doc. No. 72-18).

[18] *Id.* at 8-9.

operating a Ponzi scheme.[19]  The parties have stipulated that all transfers at issue in this

proceeding occurred within two years of the underlying bankruptcy.[20]

Conclusions of Law

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §

1334(b) and 11 U.S.C. §§ 544, 548, and 550. This is a core proceeding pursuant to 28 U.S.C. §

157(b)(2)(A), (H), and (O).

Fraudulent conveyance claims based on actual fraud are governed by section

548(a)(1)(A) of the Bankruptcy Code.  As relevant, section 548(a)(1) states:

> The trustee may avoid any transfer ... of an interest of the debtor in property…
> that was made … within 2 years before the date of the filing of the petition, if the
> debtor … made such transfer … with actual intent to hinder, delay, or defraud ...
> any entity to which the debtor … was … indebted….[21]

As a general proposition, "fraudulent conveyance claims under Section 548(a)(1)(A) turn on the

intent of the debtor in making the transfer; the state of mind of the transferee is irrelevant."[22]

Because the primary and unavoidable goal of a Ponzi scheme is to defraud investors, actual fraud

is presumed where the Debtor's sole business activity is operating a Ponzi scheme.[23]   In this

---

[19] *Id.*

[20] Stipulation at 2, ¶¶ 2-6.

[21] 11 U.S.C. § 548(a)(1).

[22] *See, e.g., In re Bayou Group, LLC*, 439 B.R. 284, 304 (S.D.N.Y. 2010).

[23] *See, e.g.,  In re McCarn's Allstate Finance,* 326 B.R. 843, 850 (Bankr. M.D. Fla. 2005)("establishing the existence of a Ponzi scheme is sufficient to prove a Debtor's actual intent to defraud); *In re Evergreen Security, Ltd.*, 319 B.R. 245, 253 (Bankr. M.D. Fla. 2003) (finding that a debtor's actual intent can be inferred from the mere existence of a Ponzi scheme); *Hayes v. Palm Seedlings Partners (In re Agricultural Research and Tech. Grp., Inc.)*, 916 F.2d 528, 535 (9th Cir. 1990) (same); *Jobin v. Waukau (In re M&L Bus. Mach. Co.)*, 166 B.R. 723, 724 (Bankr. D. Colo. 1993) ("[I]n a Ponzi scheme the only inference a court can make is that the Debtor had the requisite intent to hinder, delay or defraud under § 548(a)(1)."), *aff'd*, 167 B.R. 219 (D. Colo. 1994).

proceeding, there is substantial evidence that Engler was operating a Ponzi scheme.[24]

Accordingly, the Trustee has adequately established the requirements of section 548(a) as to the

transfers to the Defendant.  However, for separate reasons, the Trustee is precluded from

recovering the transfers.

Turning to the $2,696.40 in interest payments made to the Defendant on his personal

investment -- the full amount may be recovered unless the Defendant can establish that he took

for value and in good faith. This defense arises under § 548(c) of the Bankruptcy Code, which

provides that "a transferee … that takes for value and in good faith … may retain any interest

transferred ... to the extent that such transferee … gave value to the debtor in exchange for such

transfer …."[25]

It is undisputed that the Defendant gave value to PCO by way of his $14,980 personal

investment.[26]  However, the Defendant must also affirmatively demonstrate that the transfer was

received in good faith.[27]  On initial consideration, this appears to be a difficult task.  It is difficult

to accept that the Defendant believed he would receive such a high rate of return on a sustainable

basis.  Having possessed years of experience in the insurance and finance industries, the

Defendant admitted that he was at first skeptical of the return rate.[28]  Additionally, the

Defendant's trial testimony indicates that he attempted to visit the supposed home offices of

PCO and PCOM in June 2007 and was not able to gain access.[29]  In fact, the purported home

---

[24] Tr. at 140-163.

[25] 11 U.S.C. § 528(c).

[26] Stipulation at 1, ¶ 1.

[27] 11 U.S.C. § 528(c).

[28] Tr. at 32, 104.

[29] *Id.* at 38.

office was a post office box located in a shipping store.[30]  The Defendant was thereafter diverted

to a meeting with a PCO representative at a local fast-food restaurant before going to Mr.

Engler's home.[31]  In hindsight, all logic suggests that this was an obvious Ponzi scheme.

However, the Court's hindsight possesses informed and unbiased objectivity that the

Defendant should not be expected to have possessed.  As one legal scholar has noted, Ponzi

schemes operate on trust.[32]  Most individuals do not question their friends and family with the

same degree of skepticism and objectivity that they would afford to total strangers.  In almost

every Ponzi scheme, this "pyramid of trust" is the advantage that the Ponzi scheme operator

exploits.[33]  As such, the short-term success of the scheme does not require the organizer to

individually defraud investors one by one.  Instead, the scheme merely requires the misguided

trust of a handful of individuals who, upon receiving the promised high rate of return, promote

the scheme to *their* internal network of friends and family.[34]  Thereafter, the second tier

promotes the investment opportunity to the eventual third tier and the scheme continues to

expand until it becomes too large to sustain.

Unquestionably, the Defendant trusted Gabriel Balsiger, a PCO representative who

convinced the Defendant of the scheme's legitimacy.[35]  Besides the high return rate, there was

little to cause one to question PCO's legitimacy at the time the Defendant made his initial

---

[30] *Id.* at 36-40.

[31] *Id.* at 32.

[32] Jack F. Williams, *Ponzi Schemes: Part II*, 24 ASS'N OF INSOLVENCY AND RESTRUCTURING ADVISORS' J., no. 3, 2010 at 4.

[33] *Id.*

[34] *Id.*

[35] Tr. at 97.

investment.  In fact, the Defendant took the precautionary step of investigating Mr. Engler's

record with German securities authorities prior to brokering any investments and found nothing

suspicious.[36]  To be sure, as is not uncommon in Ponzi scheme cases, there were facts that raised

red flags, including the discovery that PCO's alleged home office address was actually a

shipping store.  However, to be balanced against these red flags, PCO was making good on its

promised rate of return.  Moreover, at the time of this discovery, the Defendant had already

brought his friends and family into the scheme.  Given these circumstances, it is reasonable to

accept that the Defendant's confirmation bias[37] allowed him to unconsciously undermine

potential red flags, placing greater weight on factors that would tend to legitimize PCO.[38]  While

it is easy to criticize after the fact, such lapses in judgment, which are often made in good faith,

are exactly what a Ponzi scheme requires.  For these reasons, the Court concludes that the

Defendant has established that he received the $2,696.40 transfer in good faith and will be

entitled to retain such funds pursuant to section 548(c).

Relying on a different legal principle, the Defendant has also demonstrated that he should

not be liable for the second group of transfers totaling $65,729.96.[39] Under Bankruptcy Code

section 550(a)(1), the bankruptcy trustee may recover the value of a fraudulent transfer from any

initial transferee.  However, the term "initial transferee" is not defined in the Bankruptcy Code.

---

[36] Tr. at 104.

[37] Confirmation bias is the "well-documented tendency once one has made up one's mind, to search harder for evidence that confirms rather than contradicts one's initial judgment." Richard A. Posner, *How Judges Think* (Harvard University Press 2008) at 110, 111.

[38] Raymond S. Nickerson, *Confirmation Bias: A Ubiquitous Phenomenon in Many Guises*, 2 REV. OF GEN. PSYCHOLOGY, no. 2, 1998 at 175-220.

[39] The Defendant is not wholly entitled to the section 548(c) defense to offset the $65,729.96 in transfers because the amount received exceeds the amount invested.  However, this point is moot because the Defendant has demonstrated that he was a mere conduit in these transactions.

In the absence of a statutory definition, the Eleventh Circuit has joined the majority of courts in applying the "control" or "mere conduit" test.[40]  The test is meant to avoid the severe and inequitable responsibility that a literal interpretation of "initial transferee" would place on financial institutions and other innocent middlemen.  Pursuant to the rule, the Defendant may not be considered an "initial transferee" unless he exercised "legal control over the assets, such that [he had] the right to use the assets for [his own] purposes."[41]  Moreover, because the available remedy is equitable in nature, the Defendant must also demonstrate that he participated in the transfer in good faith.[42]

In regard to the first element, the facts show that the Defendant did not possess adequate control over the funds at issue to permit him to be labeled an "initial transferee."  Although the funds were deposited into the Defendant's personal checking account, they were clearly earmarked as interest payments to investors in the Congro entity.[43]  Upon receiving the transfer, the Defendant promptly redistributed all of the funds to pre-designated Congro investors.[44]  Although it draws the Defendant's good faith into question, the fact that the transfer was initially directed to Congro's business account further supports the proposition that the funds were never intended to be owned or controlled by the Defendant.  For these reasons, the Defendant has adequately demonstrated that he lacked requisite control over the funds at issue.

---

[40] *Andreini & Co. v. Pony Express Delivery Servs. (In re Pony Express Delivery Servs., Inc.)*, 440 F.3d 1296, 1300 (11th Cir. 2006).

[41] *Id.*

[42] *In re Harwell*, 628 F.3d 1312, 1322.

[43] Tr. at 131.

[44] *Id.* at 91.

Despite lacking adequate control over the funds at issue, the reasons underlying why the transfers came into the Defendant's personal account once again requires inquiry as to the Defendant's good faith and innocence in participating in the underlying Ponzi scheme. As previously noted, the funds were originally directed to the business operating account at Congro Finance AG. However, because Congro's account had been frozen by Swiss authorities, PCOM's wire transfer attempt was unsuccessful. Thereafter, a representative of PCOM contacted the Defendant about using his personal account to circumvent the problems with Congro. Arguably, these facts support a finding of culpability, that is, that the Defendant intentionally conspired with PCOM to evade Swiss authorities in the furtherance of a Ponzi scheme.

In response, the Defendant offers convincing and valid reasons as to why he assisted in the transfer. First, the Defendant was a representative of Congro. As such, he felt he owed a duty to both the company and its investors to ensure that distributions continued to be timely delivered. Second, the Defendant did not know that Congro's account had been frozen due to its suspected affiliation with PCO and Engler.[45] Instead, the Defendant believed the account had been frozen due to his own failure to complete a required international monetary transfer form.[46] And the Court finds that the he had no knowledge that PCO was operating a Ponzi scheme, despite the Defendant's reasonable inquiries and prior industry experience. While the Defendant certainly should not have acted to evade the intended actions of Swiss authorities, his reasons for doing so indicate that such actions were not taken in bad faith. Rather, the Defendant received

---

[45] *Id.* at 54.

[46] *Id.*

the ill-informed transfers in a good-faith effort to make distributions to investors in the time and manner that he and his affiliated entities had promised them.

<u>Conclusion</u>

Based on the foregoing, the Court concludes that the Defendant (i) provided equal or greater value as to the first transfer totaling $2,696.40; and (ii) served as a mere conduit to the second transfer in the amount of $65,729.96.  Additionally, the Court concludes that the Defendant acted in good faith at all times relevant to this proceeding so as to entitle him to the equitable relief granted.  Accordingly, the Court will enter final judgment in favor of the Defendant.

**DATED** in Chambers at Tampa, Florida, on _____.

April 11, 2013

_____
Michael G. Williamson
United States Bankruptcy Judge

Copies to be provided by CM/ECF service.

**Robert F. Elgidely, Esq.**
**Genovese Joblove & Battista, P.A.**
*Counsel for Plaintiff*

**John L. Urban, Esq.**
**Urban Thier Federer & Chinnery, P.A.**
*Counsel for Defendant*